# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **ERRICA L.,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **Plaintiff,** | : | **1:17-CV-01774-AJB** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMISSIONER, SOCIAL** | : | |
| **SECURITY ADMINISTRATION,**[1] | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[2]

Plaintiff brought this action pursuant to § 1631(c) of the Social Security Act

("the Act"), 42 U.S.C. § 1383(c)(3), to obtain judicial review of the final decision of

the Commissioner of the Social Security Administration ("the Commissioner") denying

---

[1]    Nancy A. Berryhill was the Acting Commissioner of Social Security beginning January 23, 2017. However, her acting status ended as a matter of law pursuant to the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq*. Pursuant to Fed. R. Civ. P. 17(d), a public officer who sues or is sued in an official capacity may be designated by official title rather than by name. Since Ms. Berryhill no longer is the Acting Commissioner, the Clerk is **DIRECTED** to identify Defendant by the official title rather than by name.

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entries dated 5/17/2017 & 5/18/2017).  Therefore, this Order constitutes a final Order of the Court.

her application for Supplemental Security Income ("SSI").[3] For the reasons set forth below, the final decision of the Commissioner is **REVERSED and REMANDED** to the Commissioner for further consideration of Plaintiff's claims.

## I.  *PROCEDURAL HISTORY*

On June 24, 2013, Plaintiff protectively filed an application for Title XVI SSI benefits, [Record (hereinafter "R") 154], claiming a disability onset date of June 1, 2011, [*id.*], as orally amended to June 24, 2013.  [R54].  Plaintiff alleged that she was disabled due to bipolar disorder, schizophrenia, and psychosis.  [R188].  Her claims were denied initially and on reconsideration.  [R80, 90].  Plaintiff requested a hearing and, on February 5, 2016, testified at a hearing before an Administrative Law Judge

---

[3]     Title XVI of the Act, 42 U.S.C. § 1381, *et seq.*, provides for SSI for the disabled, whereas Title II of the Social Security Act provides for Disability Insurance Benefits ("DIB"), 42 U.S.C. § 401, *et seq.*  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "Period of Disability," or to recover SSI.  However, different statutes and regulations apply to each type of claim.  Many times parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

2

("ALJ"), where she was represented by an attorney and a vocational expert ("VE") also testify. [R40, 104]. On June 14, 2016, the ALJ found Plaintiff not disabled. [R18]. Plaintiff sought review by the Appeals Council, which on April 4, 2017, denied review, making the ALJ's decision the final agency decision. [R1-6].

Plaintiff sought judicial review of the Commissioner's decision by initiating this action on May 16, 2017. [Docs. 1, 3]. The answer and transcript were filed on October 6, 2017. [Docs. 6, 7]. On December 4, 2017, Plaintiff filed a brief seeking reversal of the Commissioner's decision, [Doc. 9], and on February 5, 2018, the Commissioner filed a response in support of the decision, [Doc. 10], to which Plaintiff filed a reply, [Doc. 14]. The matter is now before the Court upon the administrative record, and the parties' pleadings and briefs,[4] and is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, she claims that the ALJ's decision was erroneous because:

1.    The ALJ gave little or lesser weight to the opinions of every mental-health provider, failing to acknowledge their consistency,

---

[4]    Neither party requested oral argument. (*See* Dkt.).

3

relying upon unsupported speculation, and substituting his lay opinion in their stead.

2. The ALJ found that [Plaintiff] has moderate limitations in social functioning based upon the conclusions of the Agency record reviewers, yet failing, without explanation to include all the social limitations the reviewer imposed.

[Doc. 9 at 1].

### III.   STATEMENT OF FACTS

#### A.   Background

Plaintiff was born in May 1981, making her 32 years old on her alleged onset date.  [R46, 70].  She completed the eleventh grade and later received her General Equivalence Degree ("GED").  [R47].  In the past, she worked as a cleaner at a motel and as a self-employed hair braider, but only made $9,697 in her highest earning year. [R47, 50, 63].  She alleged disability due to her mental health.  [R188].

#### B.   Lay Testimony

Plaintiff testified before the ALJ that she lived with her three minor sons and that they shared in the household tasks like cooking, cleaning, and grocery shopping. [R55].  She testified that, since her alleged onset date, she has received food stamps and her eldest son's (age 17) disability payments, and that her mother helps her pay rent.

AO 72A
(Rev.8/8
2)

[R56-57]. Plaintiff stated that she took Trazodone,[5] Setraline[6] for her panic episodes, and cyclobenzaprine.[7] [R51]. She could not remember if she was ever prescribed other medications during the relevant dates, but stated that the medications made her drowsy ("like a zombie") and that she sometimes had nightmares. [R53]. She has a driver's license and does not necessarily have difficulty driving. [R54-55]. However, Plaintiff explained that she is very careful of dozing off "into my thinking" while driving because she previously did that with her children in the car, drove into oncoming traffic, and avoided a collision only when another car honked. [R55]. Plaintiff confirmed that she walks about a mile a day on the track by herself but will sometimes meet up with her mother to walk. [R57-58]. She stated that she has no friends except a 75-year-old woman. [R58].

---

[5] Trazodone is a serotonin modulator typically used to treat depression. MedlinePlus, Trazodone, https://medlineplus.gov/druginfo/meds/a681038.html (last visited 9/9/18).

[6] Zoloft (sertraline) is a selective serotonin uptake inhibitor ("SSRI") used to treat depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and social anxiety disorder. MedlinePlus, Sertraline, https://medlineplus.gov/druginfo/meds/a697048.html (last visited 9/9/18).

[7] Cyclobenzaprine, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. MedlinePlus, Cyclobenzaprine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last visited 9/9/18).

AO 72A
(Rev.8/8
2)

Plaintiff acknowledged that when she was hospitalized in May 2013 and tested positive for cocaine and methamphetamines, she was doing drugs. [R53]. She also acknowledged using illegal drugs when hospitalized in September 2013, but was not sure if they were considered methamphetamines. [R53-54]. She testified that she had not used illegal drugs since her September 2013 hospitalization. [R54]. Plaintiff drinks two small glasses of red wine a night. [R57]. She stated that she stopped using cocaine following her May 2013 hospitalization. [R64].

In response to her attorney's questioning, Plaintiff confirmed that the treatment provided by Dr. Wilson at Serenity Community Services ("Serenity") was medication and counseling at her home, which eventually she stopped because it was getting on her nerves and she would "just sit and look at them sometimes." [R58-59]. Plaintiff attends church twice a month. [R59]. She testified that she has problems because she feels "people never understand me so I isolate myself from people because I feel left out. I get paranoid when I'm around a crowd or something, I remove myself." [R60]. She described that on a typical day, she wakes at 6:00 a.m., and then wakes her children and tells them to get ready for school. [R60-61]. After her children leave at 8:00 o'clock, she dresses and performs household chores such as paying bills, running errands, cooking, and cleaning. [R61]. She testified that she takes her medication as

AO 72A
(Rev.8/8
2)

prescribed and sometimes sleeps during the day.  [*Id.*].   She explained that she could

not work a full time job because she feels

> like the owner or managers or the coworkers pick[] at me like they feel
> like I'm not fast enough, doing the work how I should be doing, so I feel
> like I'm wasting their time while they feel like I'm wasting time.  And I
> get frustrated when I'm around people.  If I get a cash register job, I run
> from it when I see people coming . . . I try to isolate myself. . . I feel like
> I would . . . click on them –go off on them . . . .

[R62].

### C.     Medical Records

### 1.       Treatment Records

On May 14, 2013, Plaintiff was admitted to the inpatient unit of Tanner Medical

Center and placed under close observation after a Form 1013 evaluation[8] at the

emergency room, where she was taken for increasing agitation and disorganized and

psychotic behaviors.  [R245].  She claimed that she and her children were in danger

---

[8]     Georgia's Form 1013 is a physician certification that authorizes transport
of an individual to an emergency receiving facility if the individual appears mentally
ill and presents a substantial risk of imminent harm to self or others as manifested by
recent overt acts or recent expressed threats of violence which present a probability of
physical injury to self or to other persons; or appears to be so unable to care for his/her
own physical health and safety as to create an imminently life-endangering crisis.  *See*
Form 1013 – Certificate Authorizing Transport to Emergency Receiving Facility &
Report of Transportation – Mental Health DBHDD By Authority of O.C.G.A.
§§ 37-3-41, 37-3-42 & 37-3-101.

AO 72A
(Rev.8/8
2)

because their father "put voodoo roots" on her child and the outcome would be her child's and her own death. [*Id.*]. She refused to stay in the hospital, demanded discharge, and claimed there was nothing wrong with her. [*Id.*].

On mental examination, she was found to have increased psychomotor activity, was restless, euphoric, labile, unpredictable, irritated, agitated, incongruent, tangential with loose associations, and had delusional ideations, and her capacity to do activities of daily living was assessed as fair. [R246]. She was diagnosed with bipolar disorder, with the most recent episode severe and manic with psychotic features, and assigned a GAF score[9] of 12-15.[10] [*Id.*]. On physical examination, the findings were unremarkable except that her urine toxicology screening was positive for amphetamines

_____

[9] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR").

[10] A GAF score between 11 and 20 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." DSM-IV-TR 34.

AO 72A
(Rev.8/8
2)

and cocaine. [R248]. She was kept as an in-patient, and prescribed Depakote[11] and Risperdal[12] at bedtime as well as group therapy. [R243].

On May 15, 2013, her thought processes were found to be tangential, but she had no delusions or hallucinations, and was less anxious, although she refused her nightly Risperdal dose. [*Id.*]. On May 18, 2013, she took her medications without side effects, continued to participate in group therapy, reported less racing thoughts, and it was concluded that her acute psychosis had resolved with treatment and she was no longer a threat to herself or others. [R244]. On May 18, Plaintiff was discharged with a plan for care that included medication maintenance and an appointment with Progressive Counseling Services ("Progressive") on May 22. [*Id.*].

On May 30, 2013, Laurie Robison, an LCSW at Progressive, performed a Biopsychosocial Assessment and found Plaintiff oriented to time, person, place, and situation, but that her speech was pressured, her demeanor preoccupied, her thoughts

---

[11] Depakote is a brand name for a medication used to treat certain types of seizures, psychiatric conditions (like manic bipolar disorder), or migraines. https://www.webmd.com/drugs/2/drug-1788/depakote-oral/details (last visited 9/9/18).

[12] Risperdal is a brand name for risperidone, one of a class of medications known as atypical antipsychotics. It is typically prescribed to treat symptoms of schizophrenia, mania, and bipolar disorder, and it is also to treat behavior problems, such as aggression, self-injury, and sudden mood changes. MedlinePlus, Risperidone, https://medlineplus.gov/druginfo/meds/a694015.html (last visited 9/9/18).

9

paranoid and confused, and her judgment impaired. [R253]. She assessed Plaintiff

with cocaine dependency, in remission for two weeks, [R256-57, 261], and major

depression with psychotic features, as well as psychotic symptoms, [R262]. Treatment

goals included remaining clean from a cocaine for one year and being able to admit her

own psychiatric symptoms. [R258]. On June 11, 2013, this plan was amended, and

Plaintiff was assessed with a GAF of 47[13] with deficits in vocational/educational,

social/interpersonal, family, community/legal, and financial areas. [R383].

Plaintiff was admitted to Southern Crescent Behavioral Health System on

September 3, 2013 for "unstable psychiatric symptoms." [R387]. Dr. Asad Naqvi

diagnosed her upon discharge on September 9, 2013 with psychosis NOS and a GAF

of 35.[14] [*Id.*].

---

[13]    A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR 34.

[14]    A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR 34.

AO 72A
(Rev.8/8
2)

On January 18, 2014, Plaintiff was seen by Denise Caldwell Obi, MS, LPC, at Serenity. [R341-47]. Obi noted that Plaintiff had two hospitalizations due to reports of delusions and paranoia, and noted that she was stable now for self-injurious behavior but exhibited current symptoms/behaviors for "moderate/frequent" aggressiveness, delusions, paranoia, depressed mood, crying spells, increased irritation/agitation, feelings of worthlessness, drug use/abuse, social withdrawal, difficulty making friends, stealing, and sleep disturbance. [R342-43]. She admitted last using cocaine in August 2013. [R344]. Obi found Plaintiff to be well groomed, cooperative, with average eye contact and activity, and a low risk to her herself or others, but described Plaintiff has having bizarre delusions and a depressed mood, plus poor impulse control, insight, and judgment. [R345-46]. Obi also noted that although Plaintiff had been prescribed Risperdol and received counseling at Progressive for the last year, she was currently off medication. [R344-45]. She assessed Plaintiff with bipolar disorder and a GAF of 53. [R347]. She concluded that

> Based on client observation and self-report [Plaintiff] will benefit from receiving the following services: Individual Therapy, Psychosocial Rehab Individual, and Psychiatric Services. Licensed Clinician will provide individual therapy to assist [Plaintiff] in exploring and processing her

AO 72A
(Rev.8/8
2)

triggers of anger through CBT.[15] Psychosocial Individual Rehabilitation Services will be advantageous in assisting [Plaintiff] with learning methods of managing her mental health symptoms, specifically her excessive mood swings and positive styles of communication. Lastly, Psychiatric Services, including medication management will aid in assessing [Plaintiff]'s need for medication as well as effectiveness of prescribed medication.

[*Id.*].

On January 21, 2014, Charmaine Wilson, M.D., a psychiatrist at Serenity, performed a psychiatric evaluation of Plaintiff. [R339]. Plaintiff advised Dr. Wilson that she was diagnosed with bipolar disorder and schizophrenia when she was hospitalized at Anchor Hospital in 2012, that her depression symptoms began when she was five years old, and worsened with the birth of her children. [*Id.*]. She described her depression as being "sad, miserable, feeling numb, and unable to concentrate," and that her bipolar disorder fluctuated between depression and being angry. [*Id.*]. She descried using cocaine from 2002 to 2013 "to regulate her mood." [*Id.*]. Dr. Wilson

---

15     CBT is the abbreviation for Cognitive Behavioral Therapy, a form of psychotherapy that treats problems and boosts happiness by modifying dysfunctional emotions, behaviors, and thoughts. Unlike traditional Freudian psychoanalysis, which probes childhood wounds to get at the root causes of conflict, CBT focuses on solutions, encouraging patients to challenge distorted cognitions and change destructive patterns of behavior. https://www.psychologytoday.com/us/basics/cognitive-behavioral-therapy (last visited 9/9/18).

12

AO 72A
(Rev.8/8
2)

assessed Plaintiff provisionally with a mood disorder NOS vs. adjustment disorder with depressed mood and anxiety, but on mental status examination, only noted a blunted affect and no delusions or agitation. [*Id.*]. From September 30, 2014 through June 13, 2015, Dr. Wilson prescribed Plaintiff Geodon[16] and Trazodone. [R349-52].

## 2. Consultative Examinations

On November 11, 2013, the Social Security Administration sent Plaintiff for a psychological status examination with Dr. Steven Snook, who performed a clinical interview and mental status examination and reviewed available records. [R273]. Dr. Snook observed that Plaintiff arrived in a timely manner, having driven herself. [R274]. Plaintiff reported that she was currently homeless and living between hotels, friends, and her vehicle after relocating to Georgia in October 2013 because "God wanted me to isolate from my city." [*Id.*]. She confirmed that she had custody of her three sons (one of whom is on disability for cerebral palsy) but receives no child support, has never been married, and has no significant other. [*Id.*].

_____

[16] Geodon (ziprasidone) is an atypical antipsychotic medication used to treat symptoms of schizophrenia and to treat "episodes of mania (frenzied, abnormally excited or irritated mood) or mixed episodes (symptoms of mania and depression that happen together) in patients with bipolar disorder." MedlinePlus, Ziprasidone, https://medlineplus.gov/druginfo/meds/a699062.html (last visited 9/9/18).

AO 72A
(Rev.8/8
2)

Plaintiff reported that she dropped out of high school in eleventh grade due to a pregnancy and unstable living environment at home, but obtained her GED in 2010. [*Id.*]. She reported that she was last employed in June 2012, for six months, as an exotic dancer at a bar in Jacksonville, but felt increasingly paranoid and was having difficulties with one of her son's fathers coming to the bar. [*Id.*]. She also braided hair on and off, but had not done so for five years and, in 2000, worked housekeeping at a hotel, but left to care for her son. [*Id.*].

Plaintiff was "vague" when describing her mental disorders and past treatment. [*Id.*]. She recalled hospitalization in September 2013 for five days, after her mother had her forcibly committed because "they needed to calm me down." [*Id.*]. She also recalled being admitted for psychiatric reasons in May 2013 because "someone put a curse on me." [274-75]. She could not recall the medications she was prescribed, but Dr. Snook noted that her medical records showed she was given Risperidone, Depakote, and Vistaril.[17] [R275]. Plaintiff had not had psychiatric care since, but did see a counselor for some in-home counseling. [*Id.*]. Plaintiff was vague about a

---

[17]    Vistaril (hydroxyzine) is used to relieve the itching caused by allergies, to control nausea and vomiting, to relieve anxiety and tension, and to treat the symptoms of alcohol withdrawal. MedlinePlus, Hydroxyzine, https://medlineplus.gov/druginfo/meds/a682866.html (last visited 9/9/18).

AO 72A
(Rev.8/8
2)

diagnosis but recalled one for bipolar psychosis and alluded to schizophrenia. [*Id.*].

Plaintiff claimed that she began having mental issues in 2012 when she had anxiety attacks and went to a primary care physician, who prescribed medication which she stopped taking because it "froze" her brain. [*Id.*]. Plaintiff also reported a family history of mental illness in her grandmother and mother. [*Id.*]. Plaintiff endorsed mood swings, waking up depressed, paranoia, suspicion of others, the onset in 2013 of auditory hallucinations telling her "you're stupid," and vague visual hallucinations of shadows. [*Id.*].

Plaintiff reported drinking wine once in a while but did not drink heavily since the age of 13. [*Id.*]. Plaintiff admitted she began smoking marijuana on a daily basis at 15, and smoked "18 blunts a day" for many years, but claimed that she stopped smoking marijuana in her mid-twenties. She denied any rehab or use of other drugs but admitted she smokes eight cigarettes a day. [*Id.*]. Plaintiff also admitted that she was awaiting her trial for simple assault and terroristic threats arising from a domestic dispute with her son's father in July 2012 that resulted in her being jailed for seven days. [*Id.*]. She also acknowledged two previous charges of domestic violence and disorderly conduct, a theft charge in 2000 (which she maintains were all misdemeanors), and a juvenile arrest resulting in detention. [*Id.*].

15

AO 72A (Rev.8/8 2)

Plaintiff reported no abnormalities or difficulties in activities of daily living, but, in social functioning, described herself as a loner who did not go to social activities like church. [R276]. She acknowledged she talked to "people in the street[,]" had several male associates, visited frequently with her mother (who has unstable housing), and speaks with her father on the phone. [*Id.*]. However, she stated that her siblings "think I'm the devil" and that she has "powers. I'm a godly child. Third eye. I've a lot of wisdom." [*Id.*]. Dr. Snook found her to be a fair historian. [R276].

On mental status examination, Plaintiff was alert and oriented to time, person, place, and situation, her speech was rambling and tangential, her mood was anxious, labile, and restless, as she shook her leg throughout, and she described her mood as "off." [R277]. When asked specifically about mania symptoms, Plaintiff described periods of excitement, no need for sleep, a tendency to become angry followed by more extended periods of depression, and complained of persistent insomnia. [*Id.*]. Dr. Snook noted "some inefficiency for short-term memory functions" as Plaintiff recalled four-out-of-four words immediately and two-out-of-four words after a five minute break, but all words with a reminder. [*Id.*]. Her insight and judgment were limited. [*Id.*].

16

Dr. Snook assessed Plaintiff with schizoaffective disorder, bipolar type; nicotine dependence; cannabis dependence in full remission; and a GAF score of 55.[18] [*Id.*]. He concluded that she would likely be capable of understanding and remembering simple but not detailed directives; sustain concentration, persistence, and pace sufficient to timely complete assigned tasks; have difficulty interacting with coworkers, supervisors, and the general public due to her mood instability, poor emotional containment, and paranoid ideation; and may have "difficulty adapting to the stress of a typical work environment given the chronicity of her mental-health concerns." [R278].

On December 12, 2013, Dr. Christen VanAsselberg reviewed Plaintiff's medical records. [R76]. Dr. VanAsselberg concluded that Plaintiff had the medically determinable impairment of an affective disorder but that it did not precisely satisfy the diagnostic criteria for schizophrenic, paranoid or other psychotic disorders. [R75]. She opined that Plaintiff's medically determinable impairments could produce her alleged symptoms, and her statements concerning the intensity, persistence and functional

_____

[18]    A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR 34.

AO 72A
(Rev.8/8
2)

limitations of her conditions were substantiated by the objective medical evidence. [R77].

In assessing Plaintiff's residual functional capacity ("RFC"), Dr. VanAsselberg found that she was not significantly limited in the following abilities: carry out very short and simple instructions; carry out detailed instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; and ask simple questions or request assistance. [R77-78]. Dr. VanAsselberg found that Plaintiff was moderately limited in the following abilities: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers and peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. [*Id.*]. In summary, Dr. VanAsselberg found that Plaintiff:

AO 72A
(Rev.8/8
2)

appears capable of understanding and following basic instructions and can maintain attention for 2hr periods within an 8hr workday. Claimant can complete a workweek without excessive interruptions from psychological symptoms, can relate appropriately to coworkers and supervisors on a limited basis, and can adapt to a job setting.

[R78].

On January 15, 2014, Robison wrote that she began treating Plaintiff at Progressive following Plaintiff's 1013 hospitalization, when she had a psychotic break, lost touch with reality, and drove her car containing her three children into oncoming traffic. [*Id.*]. Robison noted that this was not Plaintiff's first psychotic break and "despite multiple hospitalizations where she was prescribed medication, she would stop taking" it.[19] [*Id.*].

Robison explained that Plaintiff was diagnosed with PTSD, bipolar disorder (a diagnosis her brother and mother share), and cocaine dependence. [*Id.*]. Robison noted that Plaintiff was initially in denial about her condition and, during some sessions, was paranoid, delusional, manic hyperverbal, and on numerous occasions needed to be committed and assessed by the Georgia Crises and Access Center. [*Id.*]. However, Robison also noted that, once Plaintiff engaged in counseling, she opened up about significant past trauma, including a forced abortion as a teenager and being prescribed

---

[19]     The reasons Plaintiff stopped taking medication were not discussed.

19

medication for post-partum depression. [*Id.*]. Robison noted that Plaintiff is "very paranoid of psychiatrists and psychologists" and, although she persuaded Plaintiff to undergo a full psychological evaluation and see a psychiatrist monthly, Plaintiff always ultimately refuses. [R280].

> Robison concluded that Plaintiff
>
> is not able to work and should not even consider trying co work. Another psychotic break could lead to harm for herself as well as her children. Her main focus right now needs to be to get the help she needs for her own psychiatric disorder. She must be stable and followed closely by psychiatrist in order for her to be able to function well enough to take care of her own children. This writer has witnessed her have breakdowns to where she is screaming and crying trying to smash windows out. She has been deemed danger to self and others. She should have applied for disability years ago as she has been disabled she her first psychotic break when she was twenty. . . . This writer strongly recommends intensive psychiatric services. . . .

[*Id.*]. Moreover, Robison stated that she "would be able to 1013 her safely." [*Id.*].

On March 7, 2014, Joseph Garmon, Ph.D., reviewed Plaintiff's medical records and his opinions echoed Dr. VanAsselberg's. [R86-88]. However, he opined that, while Plaintiff's medically determinable impairments could produce her alleged symptoms, her activities of daily living and the objective medical evidence did not substantiate her statements concerning the intensity, persistence and functional limitations of her conditions. [R86-87]. Dr. Garmon found Plaintiff partially credible

20

AO 72A
(Rev.8/8
2)

because she lives in an apartment with her three sons and can care for herself and them and reports "she is controlling her anger better." [R87].

On April 1, 2014, Dr. Wilson, Plaintiff's treating psychiatrist at Serenity, filled out an evaluation in which she assessed Plaintiff with moderate[20] impairment in the following abilities: interact appropriately with the general public; ask simple questions or request assistance; and get along with co-workers or peers. [R294]. She assessed Plaintiff with marked[21] restrictions/impairments/deterioration in the following: her interests; personal habits; daily activities (attend meetings, work around house, socialize); understand, remember, and carry out simple and complex instructions and repetitive tasks; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; sustain a routine without special supervision; complete a normal workday and week without interruptions for psychologically based symptoms and perform, at consistent pace without unreasonable number and length of rest periods; make simple work-related decisions; respond appropriately to supervision, changes in work setting, and customary

---

[20]     The form defined "moderate" as an "impairment which affects but does not preclude ability to function." [R294].

[21]     The form defined "marked" as an "impairment which seriously affects ability to function." [R294].

work pressures; and be aware of normal hazards and take appropriate precautions. [R294-96]. Dr. Wilson opined that these impairments caused limitations or would cause limitations for 12 or more continuous months. [R296].

### D. VE Testimony

The VE testified that Plaintiff's past work as a cleaner at a motel was light unskilled work and her work as a hair braider was sedentary, semi-skilled, self-employment. [R63]. The ALJ asked the VE what work someone of Plaintiff's age, education, and past work experience could do if she had no exertional limitations but could never climb ropes, ladders, or scaffolds; never be exposed to hazards such as exposed heights, dangerous machinery, or driving; limited to simple tasks (defined as working at skill levels one or two); limited to low-stress jobs (defined as few changed in the work place); occasional simple decision-making; no working on high-speed assembly lines; and limited occasional superficial contact with the general public and coworkers. [R65]. The VE responded that this would not preclude Plaintiff's past work as a cleaner, but she could also work other medium, unskilled jobs, such as a hospital cleaner (of which there are 200,000 positions nationally), sweeper or cleaner (of which there are 28,000 positions nationally); or light, unskilled work, such as a hand assembler (of which there are 200,000 positions nationally). [R66].

AO 72A (Rev.8/82)

The ALJ then altered the hypothetical to define simple as one to two-step instructions and limit superficial contact with the public to rare and occasional superficial contact with coworkers. [R66-67]. The VE responded that this would preclude work as a cleaner but not as an assembler and she could still do other medium, unskilled work as a hand packager (of which there are 200,000 positions nationally). [R67]. Lastly, the ALJ offered a hypothetical where, on a daily basis, Plaintiff was unable to maintain focus, concentration, persistence, or pace for one-third of a workday or would need frequent, unscheduled breaks in additional to regularly scheduled ones or would continually be absent at least three days a month on an unscheduled basis. [R67-68]. The VE testified that this would preclude all full-time competitive employment. [R68].

## IV. ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact:

1. The claimant has not engaged in substantial gainful activity since June 24, 2013, the application date (20 CFR 416.971 *et seq.*).

. . .

2. The claimant has the following severe impairments: mood disorder NOS (20 CFR 416.920(c)).

23

. . .

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

. . .

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She must avoid climbing ropes, ladders and scaffolds. She must avoid moderate exposure to hazards. She can perform simple tasks (with one-two step instructions), low stress jobs only (with few changes in the workplace, occasional simple decision-making, no working on high speed assembly lines), occasional superficial contacts with coworkers, rare superficial contacts with the general public, and no working around crowds.

. . .

5.      The claimant has no past relevant work (20 CFR 416.965).

. . .

6.      The claimant was born on May 11, 1981 and was 32 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964),

AO 72A
(Rev.8/8
2)

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

. . .

10. The claimant has not been under a disability, as defined by the Social Security Act, since June 24, 2013, the date the application was filed (20 CFR 416.920(g)).

[R23-34].

In discussing Plaintiff's severe impairments, the ALJ concluded that the "evidence reflects the claimant was diagnosed with a schizoaffective disorder, which is not a medically determined impairment. The medical records reflect that the claimant received this diagnosis unknown to the mental health professional and that the claimant has been dependent recently on cocaine and was withdrawing from its use[.]" [R23-44]. The ALJ found Plaintiff's impairments of cocaine, amphetamine, and marijuana dependence were nonsevere and "in sustained remission." [R24]. In addition, the ALJ found Plaintiff's psychotic disorder was nonsevere. [*Id.*]. He concluded that these non-severe impairments did not individually or in combination

25

impose significant limitations on Plaintiff's ability to perform work related activities. [*Id.*].

The ALJ acknowledged that Plaintiff was hospitalized in May 2013 for three days due to psychotic behaviors, including thinking that the father of her child placed voodoo on her and her children. He concluded that her behavior and thoughts "normalized rapidly," and noted that "[h]er discharge diagnosis included bipolar disorder, MRE manic, severe with psychotic features, r/o schizoaffective disorder bipolar type, and a global assessment of functioning score of 12-15, despite her behavior and thoughts normalizing." [*Id.*]. He also observed that during this hospitalization, she reported no previous psychiatric hospitalization and denied taking any medication, but she tested positive for amphetamines and cocaine. He noted her aftercare report that she used cocaine from 2002 to 2013 for mood regulation, "which suggests self-medication." [*Id.*]. The ALJ further noted that Plaintiff had no prior history of inpatient care and was able to take care of her daily activities and three children. [*Id.*].

The ALJ also acknowledged that, despite medication and counseling services after her May 2013 hospitalization, Plaintiff was hospitalized again in September 2013 for five days but, because the "documentation submitted for this hospitalization was

AO 72A
(Rev.8/8
2)

rather sparse," he "determined that this hospitalization was likely because of withdrawal symptoms that the claimant was experiencing, as she testified she last used cocaine in August 2013." [*Id.*]. The ALJ also wrote that Plaintiff told Dr. Snook that "she was taken to Anchor Hospital in September 2013 and was there for five days because 'they needed to calm [her] down.' " [*Id.*]. The ALJ also explained that Plaintiff told Dr. Snook that she had not had any psychiatric care since her discharge from Anchor, and concluded that the evidence reflects that Plaintiff had no ongoing issues with psychosis or schizoaffective disorder. [*Id.*].

In evaluating whether Plaintiff met or equaled a Listing, the ALJ found that Plaintiff had moderate restrictions in activities of daily living because she lived in an apartment with her three sons, and could independently do self-care, child care, cook, perform household chores and even worked part time; she drove independently and shopped for groceries; DAS consultant Joseph Garmon, Ph.D, did not find any functional limitations in this domain; and Plaintiff's testimony reflected that there were times that she did not take her medication and admitted to drinking small glasses of wine, which may have had a slight impact on her ability to function. [R25]. The ALJ found that Plaintiff had moderate difficulties with social functioning because she could shop, read, go to the library and park, she reported no problems in getting along with

others and that she was controlling her anger better, and Dr. Garmon concluded that she had no more than moderate limitations in this domain. [*Id.*]. Likewise, the ALJ found that Plaintiff had moderate difficulties in concentration, persistence, and pace because she reported that she could manage her finances and Dr. Garmon assessed her with no more than moderate limitations in this domain. [*Id.*]. Lastly, the ALJ concluded that Plaintiff had no episodes of decompensation because both of her hospitalizations were for less than two weeks. [*Id.*].

In formulating Plaintiff's residual functional capacity ("RFC"), the ALJ first noted that her attorney contended that the only medically determinable impairment that she had was bipolar disorder based on her May 2013 hospitalization, the follow up on May 30 and 31, 2013, where she was diagnosed with bipolar disorder with psychotic features and a GAF score of 12-15, and Dr. Wilson's April 1, 2014 statement that she had moderate to marked limitation in almost every are of functioning. [R26-27]. The ALJ then concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [R28]. He discounted Plaintiff's

AO 72A
(Rev.8/8
2)

claims of isolation and frustration with others, since she: attended church twice per month; sometimes shops for groceries on her own; reported in her Function Report that she goes outside all of the time because sitting in the house "all of the time is not good"; she "hangs out" with her mother and children and on a regular basis they go to church, the library and the park; denied having problems getting along with family, friends, neighbors, or others; realized that she was the problem but blamed everyone else; could follow instructions " 'OK' " if she listened and paid attention; stated that she got along well with authorities figures except her landlord; has not been fired or laid off for not getting along; and could handle changes in a routine " 'OK.' " [*Id.*].

The ALJ also noted that Plaintiff was hospitalized in May 2013 for three days on a 1013 after becoming agitated, hyperactive, and hyperverbal after using cocaine and methamphetamines and believed that one of her children's fathers "had put voodoo roots on her"; and while she denied use of alcohol or drugs, her urinary drug screen was positive for cocaine and amphetamines. [*Id.*].

The ALJ explained that he accorded little weight to Dr. Wilson's assessment because it was done "shortly after finding out the claimant was noncompliant with taking her medications. In addition her GAF score was 60, indicating moderate symptoms, a few days earlier." [R31]. The ALJ also accorded "little weight" to

AO 72A
(Rev.8/8
2)

Robison's opinion because her opinion "was provided only a few months after the claimant's withdrawal from cocaine, which likely influenced many of the observations made," but the ALJ noted that Plaintiff's past cocaine dependence was not material to a finding of disabled. [R32].

The ALJ accorded "lesser weight" to the opinion of consultative examiner Dr. Snook because he "did not consider the claimant's longstanding use of cocaine based on the information provided during the clinical interview, which likely influenced the examiner's view of the possible schizoaffective disorder." [R31-32]. The ALJ also accorded "lesser weight" to consultative non-examining Doctors Garmon and VanAsselberg's opinions because "they were rendered within a few months of the end of the claimant's cocaine dependency." [R32].

The ALJ found that Plaintiff had no past relevant work but, based on the VE testimony, is capable of "successful adjustment to other work that exists in significant numbers in the national economy." [R34]. Specifically, the ALJ found Plaintiff could work unskilled jobs at several exertional levels such as sweeper/cleaner (a medium job with 28,000 positions nationally); hand assembler (a light job with 200,000 positions nationally); and hand packager (a medium job with 200,000 positions nationally). [*Id.*].

AO 72A
(Rev.8/8
2)

## V.    *STANDARD FOR DETERMINING DISABILITY*

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."    42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).    The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).    The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability.    *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*,

245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.

AO 72A
(Rev.8/8
2)

*Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## VI.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that

AO 72A
(Rev.8/8
2)

of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is

34

substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VII.   CLAIMS OF ERROR

### A.    The ALJ's Weighing of  Dr. Wilson's Opinion

Plaintiff contends that both reasons the ALJ gave for discrediting Dr. Wilson's opinion were not supported by substantial evidence.  First, Plaintiff claims that the Commissioner erroneously discredited Dr. Wilson's opinion by relying on an inconsistent GAF score, arguing that the GAF merely reflects her functioning without work stressors.  [Doc. 9 at 10-12].  The Commissioner responds that a GAF of 60 indicates moderate symptoms in social, occupational or school functioning and a severe limitation in one area would result in a lower score, which is at odds with the marked limitations Dr. Wilson assessed in most work areas.   [Doc. 13 at 18 (citing DSM-IV-TR at 32-34)].  Plaintiff replies, first, that Dr. Wilson's finding of marked limitations in her ability to respond appropriately to changes in the work setting and customary work pressures and moderate limitations when not working "has 'no necessary relation to [her] ability to work or to her work-related functional capacity.' "  [Doc. 14 at 6

AO 72A
(Rev.8/8
2)

(citing [R295] and quoting *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001); *Davis v. Astrue*, 287 Fed. Appx. 748, 754-55 (11th Cir. July 9, 2008))]. Second, Plaintiff argues that the GAF "does not specify specific functional abilities or limitations and does not have a direct correlation to the severity requirements in the mental disorders listings." [*Id.* (citing 65 Fed. Reg. 59, 764-65, (Aug. 21, 2000))]. Moreover, Plaintiff asserts, the GAF were omitted from the DSM-V-TR due to "conceptual lack of clarity" and "questionable psychometrics in routine practice." [*Id.* (citing DSM-V-TR 16 (5th ed. 2013))].

The Commissioner evaluates every medical opinion the agency receives, regardless of the source. 20 C.F.R. §§ 404.1527(c), 416.927(c); *cf.* 20 C.F.R. §§ 404.1527(b), 416.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); SSR 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the available evidence in the individual's case record in every case.").[22] Dr. Wilson was Plaintiff's treating physician, and thus her opinion

---

[22] Although 20 C.F.R. § 404.1527 has been superceded and SSR 06-03p—as well as SSR 96-2p and SSR 96-5p—have been rescinded, they remain applicable to cases filed prior to March 27, 2017. 20 C.F.R. § 404.1527 (2017); *Corr. Not. of Rescission of Soc. Sec. Rulings, 96-2p, 96-5p, & 06-3p*, 2017 WL 3928297 (Apr. 6, 2017); *Not. of Rescission of Soc. Sec. Rulings, 96-2p, 96-5p, & 06-3p*,

AO 72A
(Rev.8/8
2)

was due substantial or considerable weight unless the ALJ had good cause to the contrary. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing *Lewis*, 125 F.3d at 1440); *accord Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011).[23] Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips*, 357 F.3d at 1241 (citation omitted). When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate the reasons for doing so. *Id.*

Turning first to the inconsistent GAF score, the Court notes that although GAF scores "may be helpful in formulating a claimant's RFC," *Thornton v. Comm'r, Soc.*

_____

2017 WL 3928298 (Mar. 27, 2017).

[23]    The Commissioner's regulations then in effect define a "treating source" as an "acceptable medical source" who provides or has provided the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1527(a)(1), (2), 404.926(a)(1), (2). An acceptable medical source for adult mental health purposes is a "(1) Licensed physician (medical or osteopathic doctor); (2) Licensed psychologist, which includes: (i) A licensed or certified psychologist at the independent practice level[.]" *Id.* §§ 404.1502(a)(1), (2)(i), 416.902(a)(1), (2)(i). Dr. Wilson is a licensed psychiatrist at Serenity, where Plaintiff had ongoing mental health treatment, and she prescribed Plaintiff medications from September 2013 through June 2014. [R348-52].

AO 72A
(Rev.8/8
2)

*Sec. Admin.*, 597 Fed. Appx. 604, 613 (11th Cir. Feb. 11, 2015), and the Commissioner must consider "all evidence in [a claimant's] case record" when making a disability determination, 20 C.F.R. § 404.1520(a)(3), "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs.' " *Wind*, 133 Fed. Appx. at 692 n.5 (quoting *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746-01, 2000 WL 1173632 (Aug. 21, 2000)); *see also Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010) (recognizing that a GAF score may have little or no bearing on a claimant's social and occupational functioning) (cited in *Thornton*); *Wilson v. Astrue*, 653 F. Supp. 2d 1282, 1293 (M.D. Fla. 2009); *Robinson v. Colvin*, No. 8:14-CV-1533-T-TGW, 2015 WL 12856784, at *4 (M.D. Fla. Aug. 17, 2015); *see also Gasaway v. Astrue*, No. 8:06-cv-1869-T-TGW, 2008 WL 585113, at *4 (M.D. Fla. Mar. 3, 2008) (citing *DeBoard v. Comm'r Soc. Sec.*, 211 Fed. Appx. 411, 415-16 (6th Cir. Dec. 15, 2006)) (stating that "[r]eliance upon a GAF score is of questionable value in determining an individual's mental functional capacity"). Nonetheless, while a GAF score, standing alone, may not be determinative of disability, it is certainly relevant evidence of disability. *McPhadden v. Astrue*, No. 1:07-cv-00015-MP-WCS, 2007 WL 4403210, at *10 (N.D. Fla. Dec. 12, 2007). In making a disability determination "[the

38

Commissioner] will always consider the medical opinions in [the] case record together with the rest of the relevant evidence . . . receive[d]." 20 C.F.R. § 404.1527(b). Therefore, although the GAF scale does not have a direct correlation to the severity requirements in Commissioner's mental disorders listings (*see* 65 Fed. Reg. 50746, 50764-65), the ALJ can consider the GAF scores in making his determination because they represent a piece of evidence in the record. *Webb v. Colvin*, No. CIV. 13-1491 DWF/SER, 2014 WL 4668974, at *32 (D. Minn. Sept. 18, 2014).

Nevertheless, other district courts in this Circuit have held that even if a treating physician's assigned GAF is inconsistent with his overall findings, a single inconsistent statement does not provide good cause to reject the detailed opinion of a treating physician. *Gumbs v. Colvin*, No. 3:12-CV-275-J-TEM, 2013 WL 5490285, at *7 (M.D. Fla. Sept. 30, 2013); *Chavanu v. Astrue*, No. 3:11-CV-388-J-TEM, 2012 WL 4336205, at *4 (M.D. Fla. Sept. 21, 2012) ("even if Dr. Hurley's assigned GAF was inconsistent with her overall findings, a single inconsistent statement does not provide good cause to reject in its entirety the detailed opinion of a treating physician") (citing *Hill v. Astrue*, No. 1:09CV77-SRW, 2010 WL 3724502, at *12 (M.D. Ala. Sept.14, 2010) (noting a treating physician's assigned GAF score "would not be sufficient, standing alone, to discredit his opinion")).  As a result, the Court is

AO 72A
(Rev.8/8
2)

reluctant to hold that an ALJ can discredit a treating physician's opinion on the basis of an inconsistent GAF alone.

However, the ALJ also explained that he accorded little weight to Dr. Wilson's assessment because it was done "shortly after finding out the claimant was noncompliant with taking her medications." [R31]. Plaintiff claims that this is irrelevant, as Dr. Wilson "knew she wasn't compliant, yet imposed the disabling limitations anyway . . . [and] there is no evidence, apart from the ALJ's assumptions, that [Plaintiff] would not have disabling limitations if fully compliant." [Doc. 9 at 12]. Plaintiff argues that the ALJ has a duty to fully investigate possible reasons for the alleged noncompliance, especially where those reasons might be mental health limitations, which are acceptable reasons for failing to follow prescribed treatment. [*Id.* at 13-15 (citing SSR 16-3p; *Conway v. Colvin*, No. 3:14-cv-1004-J-JRK, 2015 U.S. Dist. LEXIS 132699, at *11-12 (M.D. Fla. Sept. 30, 2015))]. The Commissioner responds that Plaintiff assumed, but did not prove, that her non-compliance was due to her mental disorders and the fact that such disorders can result in non-compliance does not show, in the absence of other evidence, that Plaintiff's disorder prevented her from complying with treatment. [Doc. 13 at 18-19].

40

"A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting *Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir. 1987)).  The language of the regulations sets forth four requirements before a claimant's disability benefits can be terminated for the willful failure to follow prescribed treatment: (1) the impairment must have been amenable to treatment to restore the claimant's ability to work, (2) the treatment must have been prescribed, (3) the treatment must have been refused, and (4) the refusal must have been willful with no justifiable excuse." *Jones v. Heckler* 702 F.2d 950, 953 (11th Cir. 1983).  "Where prescribed medical treatment would restore the ability to work, a claimant's "refusal to follow [that] treatment without a good reason will preclude a finding of disability." *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005) (quoting *Ellison v. Barnhart,* 355 F.3d 1272, 1275 (11th Cir. 2003) (internal quotations omitted)).

Although the Eleventh Circuit has not held that an ALJ is required to consider the effect of a claimant's mental illness on his or her noncompliance, several district courts within the Circuit, as well as other circuit courts, have highlighted the importance of doing so.  *See Stone v. Berryhill*, No. 3:16-CV-1588-J-JRK, 2018 WL 1082439, at *10 (M.D. Fla. Feb. 28, 2018); *Kidd v. Comm'r of Soc. Sec.*,

41

No. 6:15-cv-535-Orl-DAB, 2016 WL 3090401, at *5 (M.D. Fla. June 2, 2016) (finding that "a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse' ") (quoting *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (some alterations in original)); *Conway v. Colvin*, No. 3:14-CV-1004-J-JRK, 2015 WL 5772056, at *4 (M.D. Fla. Sept. 30, 2015) (noting that "a number of courts have recognized the importance of considering whether a claimant's bipolar disorder or other mental illness contributes to the claimant's noncompliance with medication"); *see also Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (stating that the Seventh Circuit has "often observed that bipolar disorder . . . is by nature episodic and admits to regular fluctuations even under proper treatment" and has therefore held that "ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference"); *Pate-Fires*, 564 F.3d at 945 (stating that "[c]ourts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication"); *Garrison v. Colvin*, 759 F.3d 995, 1018 n.24

42

(9th Cir. 2014) (stating that the court "do[es] not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions").

Here, Dr. Wilson–who prescribed the medications that Plaintiff failed to take and opined that she had marked limitations–did not find that Plaintiff's symptoms would resolve with compliance. This conclusion solely was the ALJ's. As the Commissioner has concluded,

> if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. *We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons* he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints. When we consider the individual's treatment history, we may consider (but are not limited to) one or more of the following . . . Due to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment.

AO 72A
(Rev.8/8
2)

SSR 16-3p (emphasis added).[24]  Thus, contrary to the SSR 16-3p, the ALJ did not consider Plaintiff's reasons for non-compliance, despite, for example, an opportunity to question Plaintiff at her hearing.   Therefore, Plaintiff's unexplained non-compliance–without more–is not sufficient to discount Dr. Wilson's opinion.

As the GAF score of 60 and Plaintiff's non-compliance with prescribed medication were the sole bases proffered by for the ALJ for his decision to accord "little weight" to Dr. Wilson's opinion, for the reasons stated herein, the Court concludes that the weight assigned to Dr. Wilson's opinion was not supported by substantial evidence.[25]

---

[24]   Social Security Rulings are published under the authority of the Commissioner and are binding on all components of the administrative process.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).  Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *see also Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

[25]   Although Plaintiff proffered numerous other reasons why the ALJ erred by according little weight to Dr. Wilson, these were the only reasons actually proffered

Accordingly, the final decision of the Commissioner is due to be **REVERSED and REMANDED** for the Commissioner to reconsider the weight assigned to Dr. Wilson's opinion consistent with this decision.

### B.    The ALJ's Weighing of the Opinions of Other Medical Sources

Plaintiff also claims that the ALJ relied on Plaintiff's past drug abuse as a reason to discount the remainder of the experts' opinions, despite the fact that the experts were aware of her past drug use when they imposed their limitations, [Doc. 9 at 18 (citing [R76, 85-86, 275])], and despite the ALJ's own finding that Plaintiff's cocaine and marijuana dependence were non-severe impairments in " 'full-sustained remission[.]' " [*id.* (quoting [R24])].  Plaintiff adds that the ALJ is not a medical expert and thus is not free to substitute his own opinion for those of the experts.  [*Id.* (citing *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982))].

---

by the ALJ for the weight accorded to Dr. Wilson.  The Court's role is not to decide facts anew or reweigh the evidence, but to decide if the ALJ applied the proper legal standards.  *See Washington*, 558 F. Supp. 2d at 1296; *Fields*, 498 F. Supp. at 488; *Dyer*, 395 F.3d at 1210.  Therefore, in addressing Plaintiff's argument that the ALJ failed to properly weigh her treating physician's opinion, the Court will confine its analysis to whether the ALJ's proffered reasons for discounting Dr. Wilson were proper, rather than whether the Plaintiff's proffered reasons for fully crediting Dr. Wilson apply.

AO 72A
(Rev.8/8
2)

Here, Dr. Snook and Robison were examining sources, whereas, Drs. VanAsselberg and Garmon were non-examining sources. The ALJ "accorded little weight [to Robison's opinion] because it was provided only a few months after Plaintiff's withdrawal from cocaine, which likely influenced many of the observations made." [R32]. The ALJ accorded "lesser weight to the opinion of Dr. Snook because the examiner did not consider the claimant's longstanding use of cocaine based on the information provided during the clinical interview." [*Id.*]. The ALJ accorded Drs. VanAsselberg and Garmon's opinions "lesser weight given that they were rendered within a few months of the end of the claimant's cocaine dependence." [*Id.*].

Plaintiff claims that the ALJ's assigning little weight to Robison's opinion was error because she was well-aware of Plaintiff's drug use five months prior and the ALJ lacks expertise to discount her opinion. [Doc. 9 at 17]. The Commissioner responds that Robison's formal treatment of Plaintiff occurred shortly after her hospitalization and that there are no reports from subsequent treatment providers corroborating Robison. [Doc. 13 at 19]. Plaintiff replies that this a post hoc rationalization and, at any rate, it is factually incorrect, as treatment notes from Serenity in January 2015 corroborate Robison and show that Plaintiff's condition did not improve. [Doc. 14 at 9].

46

As previously stated, the Commissioner evaluates every medical opinion the agency receives, regardless of the source. 20 C.F.R. §§ 404.1527(c), 416.927(c); *cf.* 20 C.F.R. §§ 404.1527(b), 416.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); SSR 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the available evidence in the individual's case record in every case."). Thus, both examining and non-examining sources provide opinion evidence for the ALJ to consider in rendering a decision. 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e). In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

The Court, first, agrees that the Commissioner's assertion that Robison's opinion is not corroborated by later treatment records is an impermissible post hoc rationalization. *See Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) ("We

AO 72A
(Rev.8/8
2)

decline . . . to affirm simply because some rationale might have supported the ALJ's conclusion. Such an approach would not advance the ends of reasoned decision making."). The ALJ did not cite this reason for discounting Robison's opinion, and thus the Commissioner's citing that reason as a justification for the ALJ's opinion is rejected.

Second, while the ALJ summarized many of Plaintiff's medical records that note her cocaine use, that does not mean he is qualified to interpret her drug use's effect on her mental health and any ensuing work-based limitations imposed in the absence of an examining medical opinion. Circuit Judge Johnson's observations a number of years ago still are persuasive today:

> An ALJ may, of course, engage in whatever idle speculations regarding the legitimacy of the claims that come before him in his private or personal capacity; however, as a hearing officer he may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional.

> Although Social Security disability benefits must be reserved only for those who qualify to receive them, an ALJ may not arrogate the power to act as both judge and physician. The ALJ in this case clearly exceeded his legal authority by allowing his personal views regarding the non-physical source of Marbury's seizure disorder to interfere with his responsibilities to administer fairly the Social Security disability programs. On remand, let us hope that the ALJ refrains from playing doctor and instead satisfies himself with merely serving as a judge.

AO 72A
(Rev.8/8
2)

*Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1991) (per curiam) (Johnson, J., concurring); *see Hillsman*, 804 F.2d at 1182 (holding that the Commissioner may not reject the opinion of a treating physician simply because the ALJ "reached a different conclusion after reviewing the medical records"); *Freeman*, 681 F.2d at 731 (holding that the ALJ improperly substituted his judgment of the claimant's condition for that of the medical and vocational experts); *see also Goodley v. Harris*, 608 F.2d 234, 236 n. 1 (5th Cir. 1979) (may be reversible error for ALJ to substitute lay opinion regarding treatment for that of medical expert); *Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009) (holding that the ALJ impermissibly "played doctor" when he reached his own independent medical conclusion in finding that Plaintiff was not disabled because no doctor prescribed insulin), *cited in Miller v. Colvin*, No. 1:14-CV-01393-AJB, 2015 WL 5601868, at *12 (N.D. Ga. Sept. 23, 2015). *Cf. Cole-Smith v. Astrue*, 2:11-CV-2857-VEH, 2012 WL 1946766, at *6-7 (N.D. Ala. May 29, 2012) (holding that where the medical records were raw physical findings with no opinion about the impact of plaintiff's impairments in vocational terms or a physical capacities evaluation, "a lay person such as an ALJ is not able to discern [Plaintiff's] . . . work-related exertional abilities and appropriate non-exertional restrictions based upon the unfiltered information contained in her medical records.").

49

In this case, the ALJ's treatment of the expert opinions in light of Plaintiff's drug usage is a mixed bag. The Court first finds that the ALJ's assigning lesser weight to Dr. Snook's opinion is based on substantial evidence, because Plaintiff did not discuss her cocaine usage with Dr. Snook, only her marijuana usage. A fair reading of the ALJ's consideration of Dr. Snook's assessment is not that the ALJ substituted his lay opinion for Dr. Snook's, but rather that Dr. Snook's opinion was not based on Plaintiff's truthful recitation of her cocaine abuse, [*see* R32 (according lesser weight to Dr. Snook's opinion because "the examiner did not consider the claimant's longstanding use of cocaine *based on the information provided during the clinical interview*, which likely influenced the examiner's view of possible schizoaffective disorder") (emphasis added)].

On the other hand, the ALJ based his rejection of the other opinions solely on his surmise that those opinions must have been influenced by Plaintiff's recent drug usage, and therefore ran afoul of *Freeman*'s prohibition of an ALJ substituting his opinion for that of the physicians where the "core of the ALJ's assessment is a medical one." *Freeman*, 681 F.2d at 731. Thus, the Court agrees with Plaintiff that the ALJ's stated reason for the weight accorded to Robison's opinion amounts to a substitution

50

of the ALJ's medical judgment for that of medical professionals.[26] Likewise, it is clear that Dr. Garmon was aware of both Plaintiff's cocaine (and marijuana) usage, [R85, 86], as was Dr. VanAsselberg, [R76]. As to these practitioners' opinions, the ALJ improperly substituted his lay opinion for how they should have assessed Plaintiff's impairments.

Accordingly, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case so that the ALJ can properly weigh the opinions of the medical sources and, if necessary, order additional consultative examinations to obtain a medical opinion on the impact, if any, that Plaintiff's drug use has on her alleged impairments.

### C. Whether the RFC Was Incomplete Because the ALJ Failed to Include All Plaintiff's Social Limitations

Plaintiff claims that the RFC is not supported by substantial evidence because the ALJ relied on Dr. Garmon's opinion that Plaintiff had moderate limitations in social functioning but, subsequently and without explanation, excluded any limitations on

---

[26] Robison is an LCSW, which is not an acceptable medical source. 20 C.F.R. § 404.1513(a). Therefore, her opinions were not subject to any special consideration or evaluation. SSR 06-3p; *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004). However, since neither the ALJ nor the Commissioner in this action rely on this reason for rejecting Plaintiff's argument, the Court will not discuss it..

AO 72A
(Rev.8/8
2)

Plaintiff's interaction with supervisors in the RFC. [Doc. 9 at 21-22 (citing [R25-26, 86-88; *Winschel*, 631 F.3d at 1179; *Cowart v. Schweiker*, 662 F.2d 731,. 735 (11th Cir. 1981); *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004); *Pfeiffer v. Astrue*, 576 F. Supp. 2d 956, 962 (W.D. Wisc. 2008); *Dillard v. Colvin*, No. 1:14-cv-02185-AJB, 2016 U.S. Dist. LEXIS 41723, at *59-60 (N.D. Ga. Mar. 18, 2016))].

The Commissioner does not directly address this argument, asserting, instead, that substantial evidence supports the RFC because "the evidence reflects a small amount of routine treatment since Plaintiff discontinued cocaine" and summarized the various 2014 treatment records that the Commissioner alleges establish that Plaintiff's conditions improved. [Doc. 13 at 21-22]. Plaintiff replies that "nothing in its re-recitation of some of the evidence explained why the ALJ failed to impose any limits on [Plaintiff's] ability to interact with supervisors while imposing limits on her ability to interact with coworkers and the public." [Doc. 14 at 12-13].

The Court disagrees with Plaintiff's assertion that the ALJ relied upon Dr. Garmon's opinion to find she had moderate limitations in social functioning. Dr. Garmon found Plaintiff had no significant limitations in carrying out instructions, sustaining an ordinary routine without special supervision, making simple work-related decisions, and asking simple questions or requesting assistance, and a moderate

AO 72A
(Rev.8/8
2)

limitation in accepting instructions and responding appropriately to criticism from supervisors. [R77-8]. While the RFC incorporated some of the limitations expressed in Dr. Garmon's assessment, it did not include limitations regarding interactions with supervisors. The ALJ did not explain this omission, but, instead, summarized Plaintiff's testimony concerning her interactions with supervisors/authority figures as follows:

> She says she can follow spoken instructions, "OK" if she listens and pays attention. She also says she gets along well with authority figures, except for problems with her landlord. She had never been fired or laid off from a job because of problems getting along with other people and can handle changes in a routine "OK" . . . .

[R28 (citing 201-09)]. He also explained that Dr. Garmon's assessment was one of the factors considered in determining Plaintiff's mental health impairments, [R25], but, accorded lesser wight to Dr. Garmon's overall opinion, [R32].

While the ALJ must weigh the medical source opinions according to 20 C.F.R. § 404.1527(c) factors, the regulations do not require the ALJ to explicitly identify all the factors. *See id.* (stating only that the Commissioner "consider[s] all of the following factors in deciding the weight [he] gives to any medical opinion"); *see also Amilpas v. Astrue*, No. 09-cv-0389, 2010 WL 2303302, *6 (W.D. Tex. May 17, 2010) ("I cannot conclude that the ALJ made a legal error [] because the regulations do

53

not require the ALJ to explicitly address each 404.1527(d) factor.") (R&R), *adopted by* 2010 WL 2756552 at *5 & n.38 (W.D. Tex. July 12, 2010).  Additionally, the Social Security Ruling interpreting § 404.1527(d) does not require an ALJ to explicitly identify these six factors in the opinion, only that the treating source medical opinions "must be weighed using all of the factors provided" by § 404.1527.  SSR 96-2p.  Third, courts have concluded that an ALJ does not err by failing to expressly address each of the factors outlined in 20 C.F.R. § 404.1527(d).  *See Armijo v. Astrue*, 385 Fed. Appx. 789, 795 (10th Cir. June 16, 2010) (citing *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)).

Thus, contrary to Plaintiff's assertion, the ALJ need not explicitly explain why he did not fully credit the moderate limitations in Plaintiff's ability to respond appropriately to criticism identified by Dr. Garmon.  However, it is clear to the Court that the ALJ considered the Dr. Garmon's opinion regarding her ability to interact with supervisors in the context of Plaintiff's own assertions reflecting that these limitations did not interfere with Plaintiff's interaction with supervisors.  [R28].

Moreover, Plaintiff has pointed to no part of the record that bolsters Dr. Garmon's assessed limitations in responding to supervisors' criticisms.  Therefore, even assuming the ALJ did err in failing to explicitly link each of the social limitations

54

assessed by Dr. Garmon with corroborating parts of the record, Plaintiff has not shown how that it would change her RFC. As a result, to the extent that the ALJ's failure to explicitly identify why he did not fully credit Dr. Garmon's assessed social limitations was error, it was harmless error and the Court finds no reversible error on this issue. *See*, *e.g.*, *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987) (applying harmless error analysis in Social Security case); *Young v. Astrue*, No. 8:09-cv-1056, 2010 WL 4340815, *4 (M.D. Fla. Sept. 29, 2010) (holding that, generally, an error is harmless in a Social Security case if it "do[es] not affect the ALJ's determination that a claimant is not entitled to benefits.").

Accordingly, the Commissioner's final decision is **AFFIRMED** on this enumeration of error.

## VIII. CONCLUSION

In conclusion, the undersigned United States Magistrate Judge **REVERSES** the final decision of the Commissioner and **REMANDS** this matter for further consideration of Plaintiff's claims consistent with the opinion of the Court.

The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff.

AO 72A
(Rev.8/8
2)

**IT IS SO ORDERED and DIRECTED**, this the __13th__ day of September, 2018.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)